# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

VIRGINIA MILLER
308 LLANDRILLO ROAD
BALA CYNWYD, PA 19004

**DEFENDANTS**

FIRST UNUM LIFE INSURANCE COMPANY
THE BENEFITS CENTER
P.O. 100158
COLUMBIA, SC 29202

**(b)** County of Residence of First Listed Plaintiff __Montgomery, PA__
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant __Richland, SC__
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
JAMES R. FLANDREAU, ESQUIRE AND TIMOTHY A. BERGER, ESQUIRE
PAUL, FLANDREAU & BERGER, LLP
320 W. FRONT STREET
MEDIA, PA 19063
610-565-4750

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☒ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities Other / **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | / ☐ 550 Civil Rights | | | |
| | / ☐ 555 Prison Condition | | | |
| | / ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. Sec. 1132(a); 28 U.S.C. Sec. 1132(g);

Brief description of cause:
Defendant has terminated long-term disability benefits issued to Plaintiff Virginia Miller in connection with her employment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 1,155,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE 4/16/14

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN

## DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VIRGINIA MILLER<br>308 Llandrillo Road<br>Bala Cynwyd, PA 19004<br>      Plaintiff | :<br>:<br>: |
| v. | : |
| | : |
| FIRST UNUM LIFE INSURANCE<br>      COMPANY<br>The Benefits Center<br>P.O.100158<br>Columbia, SC 29202<br>      Defendant | :<br>:<br>: |

## CIVIL ACTION-COMPLAINT
## ERISA
## STATUTORY JURISDICTION-29 U.S.C.§1132

## STATEMENT OF JURISDICTION AND VENUE

1. Jurisdiction exists pursuant to 29 U.S.C. §1132(e) since this action seeks to recover benefits under 20 U.S.C. §1132(a); in addition, jurisdiction exists under 28 U.S.C. §1331 since this is a civil action arising under the laws of the United States.

2. Venue exists in the United States District Court for the Eastern District of Pennsylvania as the Defendant does business in the Commonwealth of Pennsylvania, and has a field office located at 1001 Liberty Avenue, Suite 1000, Pittsburgh, PA 15222.

## IDENTIFICATION OF THE PARTIES AND PERSONS IN INTEREST

3. Plaintiff is Virginia I. Miller, an adult individual residing at 308 Llandrillo Road, Bala Cynwyd, PA 19004.

4.  Defendant is the First Unum Life Insurance Company ("UNUM") whose corporate parent company, Unum Group, consists of Unum U.S. with its main office at 1 Fountain Square, Chattanooga, Tennessee  37402 and a Benefits Center at 1200 Colonial Life Boulevard, Columbia, South Carolina 29230.

## FACTUAL ALLEGATIONS

5.  At all times relevant hereto, Plaintiff Virginia I. Miller was an attorney at the law firm of Anderson Kill & Olick, P.C., a law firm with a principal address of 1251 Avenue of the Americas, New York, NY  10020 ("AKO ").

6.  Plaintiff Virginia I. Miller was covered for long term disability benefits ("LTD benefits") by a group plan offered by AKO.  A true and correct copy of the Group Long Term Disability Plan, Policy No. 43738 (the "Policy") is attached hereto and incorporated herein by reference as Exhibit A.

7.  The Policy issued and administered by UNUM constitutes an employee benefit plan pursuant to the Employees Retirement Income and Security Act, 29 U.S.C. § 1001 et seq.

8.  Plaintiff Virginia I. Miller was covered by the Policy.

9.  The Policy provides for payment of 60% of basic monthly earnings up to a maximum monthly benefit of $20,000.

10.  The Policy provides for payment of LTD benefits until the age of 65 when the age at disability is less than age 60.

11.  On or about 5:00 PM on August 25, 2009, Plaintiff Virginia I. Miller fell and suffered a closed head trauma and sustained a moderate to severe concussion resulting in cognitive difficulties, memory fatigue and light sensitivity.  At the time of her injury, Plaintiff was 44 years old.

2

12. As of December 3, 2009, according to Plaintiff's medical doctor, she was only capable of working on a part time basis. Plaintiff notified UNUM of her part time status on December 29, 2009.

13. On January 7, 2010, Plaintiff was placed on full time leave by her medical doctor. Plaintiff notified UNUM of her full time medical leave status on January 8, 2010.

14. Plaintiff began collecting LTD benefits under the terms of the Policy on July 7, 2010, Claim number 5768254.

15. By letter dated July 11, 2012, Plaintiff's counsel was notified that as of July 5, 2012, UNUM would no longer continue to pay Plaintiff's LTD benefits under the Policy because her disability was a mental illness and she accordingly was only entitled to 24 months of benefits under the terms of the Policy. A true and correct copy of the July 11, 2012 letter is attached hereto and incorporated herein by reference as Exhibit B.

16. Plaintiff provided UNUM with a complete copy of all of her medical records that she was able to obtain, all of which indicated that Plaintiff was suffering from a post-concussion syndrome, not a mental illness.

17. By letter dated August 20, 2012, UNUM stated that the information supplied with respect to Plaintiff's medical condition was not sufficient to reverse their previous decision issued on July 11, 2012. A true and correct copy of the August 20, 2012 letter is attached hereto and incorporated herein as Exhibit C.

18. By letter dated December 31, 2012, Plaintiff appealed UNUM's termination of LTD benefits in accordance with the policy and the instructions set forth in the letter from UNUM dated July 11, 2012. A true and correct copy of the letter appealing UNUM's determination to terminate Plaintiff's LTD benefits as of July 5, 2012, is attached hereto and incorporated herein

by reference as Exhibit D.  The appeal was acknowledged by UNUM by letter dated January 2, 2013.

19.  After the submission of additional evidence by Plaintiff, UNUM by letter dated May 3, 2013, again denied Plaintiff's appeal for benefits. A true and correct copy of the denial letter is attached hereto and incorporated herein by reference as Exhibit E.

20.  By letter dated February 10, 2014, Plaintiff forwarded medical records for the period from March 22, 2013 to December 24, 2013 that she had only just succeeded in obtaining from the Veteran's Administration (the "VA").  A true and correct copy of the transmittal letter is attached hereto and incorporated herein by reference as Exhibit F.  UNUM had no records from the VA.  Plaintiff thus asked that UNUM reopen the appeal and consider the VA records.

21.  By letter dated February 21, 2014, UNUM declined to reopen the appeal or consider the VA records.  A true and correct copy of UNUM's letter is attached hereto and incorporated herein by reference as Exhibit G.

22.  Plaintiff has complied with all terms and conditions precedent of the Policy and all reasonable requests made by UNUM.

23.  Plaintiff has now exhausted all administrative remedies under the Policy.

24.  The grounds which UNUM asserted for refusing to continue Plaintiff's LTD benefits are arbitrary, capricious, improper, insufficient, and invalid.

25.  UNUM's refusal and failure to continue paying long term disability benefits to Plaintiff has caused Plaintiff economic distress and hardship.

**FIRST CAUSE OF ACTION**

26.  Plaintiff hereby incorporates by reference as if set forth herein the averments in Paragraphs 1 through 25, above.

4

27. Plaintiff respectfully requests that the Court consider the administrative record compiled in this case, as well as all supplements to that record and declare, pursuant to 29 U.S.C. §1132(a)(1)(B), that Plaintiff is entitled to the long term disability benefits which she seeks under the terms of the Policy.

## SECOND CAUSE OF ACTION

28. Plaintiff hereby incorporates by reference as if set forth herein the averments in Paragraphs 1 through 27 above.

29. Plaintiff contracted with UNUM for LTD benefits.

30. By refusing to continue to pay Plaintiff's LTD benefits despite medical evidence clearly evidencing that Plaintiff is suffering from post-concussive syndrome and not mental illness, UNUM breached its contract with Plaintiff, and Plaintiff is entitled to recover for such breach.

## THIRD CAUSE OF ACTION

31. Plaintiff hereby incorporates by reference as if set forth herein the averments in Paragraphs 1 through 30 above.

32. Due to UNUM's refusing to continue to pay Plaintiff's LTD benefits despite medical evidence clearly evidencing that Plaintiff is suffering from post-concussive syndrome and not mental illness, Plaintiff is entitled to equitable relief under 29 U.S.C. §1132(a)(3)(B) including, but not limited to prejudgment interest on past due disability benefits.

## ATTORNEY FEES

33. Plaintiff hereby incorporates by reference as if set forth herein the averments in Paragraphs 1 through 32 above.

28.  To the extent that UNUM violated any provisions of Subchapter I of Title 29, Chapter 18 of the United States Code, Plaintiff is entitled to reasonable attorney's fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, Plaintiff Virginia I. Miller asks that this Court enter judgment in her favor awarding the relief as pleaded herein including, but not limited to, the payment by UNUM of past due and ongoing total disability benefits,together with such other equitable relief as the Court deems just and proper.

PAUL, FLANDREAU & BERGER, LLP

By:_____

JAMES R. FLANDREAU, ESQUIRE
I.D. NO. 39562
TIMOTHY A. BERGER, ESQUIRE
I.D. No. 72954
320 West Front Street
Media, PA  19063
610-565-4750
610-565-5294 (fax)

6

# EXHIBIT A



**Anderson Kill & Olick PC**

Your Group Long Term Disability Plan

Policy No. 43738

Underwritten by Unum Life Insurance Company of America

03-2002

**TABLE OF CONTENTS**

CERTIFICATE OF COVERAGE . . . . . . . . . . . . . . . . . . . . 1

PLAN OUTLINE . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TERMS YOU SHOULD KNOW    . . . . . . . . . . . . . . . . 4

ENROLLMENT AND DATE INSURANCE STARTS . . . . . . . . . . 9

DISABILITY   . . . . . . . . . . . . . . . . . . . . . . . . . . 10

RECURRENT DISABILITY . . . . . . . . . . . . . . . . . . . . 14

SURVIVOR BENEFIT   . . . . . . . . . . . . . . . . . . . . . 15

GENERAL EXCLUSIONS . . . . . . . . . . . . . . . . . . . . . 16

PRE-EXISTING CONDITION EXCLUSION    . . . . . . . . . . . . 16

MENTAL ILLNESS LIMITATION   . . . . . . . . . . . . . . . . 17

COST OF LIVING ADJUSTMENT   . . . . . . . . . . . . . . . . 18

TERMINATION   . . . . . . . . . . . . . . . . . . . . . . . . 19

CONVERSION PRIVILEGE . . . . . . . . . . . . . . . . . . . . 20

SOME GENERAL INFORMATION TO KNOW   . . . . . . . . . . . 21

ERISA   . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Additional Summary Plan Description Information   . . . . . . . . . . . 23

LC.IND

## SYNOPSIS

The insurance evidenced by this certificate provides disability income insurance only.  It does NOT provide basic hospital, basic medical or major medical insurance as defined by the New York State Insurance Department.

## EXCLUSIONS

General Exclusions:  see page 16.

Pre-existing Condition Exclusion:  see page 16.

## LIMITATIONS

## PLAN OUTLINE

### Description of Eligible Classes

All employees

### Amount of Insurance

- 60% (benefit percentage) of basic monthly earnings not to exceed the maximum monthly benefit, less other income benefits.

    Note:  This benefit is subject to reductions for earnings as provided in the section titled "How is the benefit figured?"

- The maximum monthly benefit is $20,000.
- The minimum monthly benefit is the greater of:
  1. $100.00; or
  2. 10% of the monthly benefit before deductions for other income benefits.

### Maximum Benefit Period

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | To age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

**Elimination Period:**  180 days

**Minimum Requirement for Active Employment:**  28 hours per week

### Definition of Basic Monthly Earnings

"Basic monthly earnings" means your monthly rate of earnings from the employer in effect just prior to the date disability begins.  It does not include commissions, bonuses, overtime pay and other extra compensation.

LC.PO.2.1                 2

**Waiting Period:**

- If you were in an eligible class on or before the policy effective date: None
- If you entered an eligible class after the policy effective date:  1 month

**Contributions**

You may decide upon hire, and determined annually, to pay all or a portion of the cost of your insurance.  If you do not pay the cost of your insurance, the cost will be paid by your employer.

**Change Effective**
Subject to the delayed effective date exceptions, changes in insurance take effect immediately.

**Continuation of Your Insurance During Certain Absences**

| Type of Absence | Time Limit |
|---|---|
| Temporary Layoff or Leave of Absence | To the end of the policy month following the policy month in which the layoff or leave of absence begins. |

**TERMS YOU SHOULD KNOW**

Many terms used in your certificate of coverage have special meanings.  A list of these terms and meanings follows:

- "Active employment" means you must be working:
    1.  for your employer on a permanent full-time basis and paid regular earnings;
    2.  at least the minimum number of hours shown in the plan outline; and either
    3.  at your employer's usual place of business; or
    4.  at a location to which your employer's business requires you to travel.
- "Basic monthly earnings" - as defined in the plan outline.
- "Complications of pregnancy" means pregnancy complicated by concurrent disease or abnormal conditions significantly affecting usual medical management.
- "Disability" or "disabled" - see the end of these terms.
- "Disability benefits," when used with the term retirement plan, means money which:
    1.  is payable under a retirement plan due to disability as defined in that plan; and
    2.  does not reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan if the disability had not occurred.  (If the payment does cause such a reduction, it will be deemed a retirement benefit as explained in this certificate of coverage.)
- "Eligibility date" means the date you become eligible for insurance after completing the waiting period shown in the plan outline.
- "Elimination period" means a period of consecutive days of disability for which no benefit is payable.  The elimination period is shown in the plan outline and begins on the first day of disability.

    Note:  If disability stops during the elimination period for any 30 (or less) days, then the disability will be treated as continuous.  But days that you are not disabled will not count toward the elimination period.

- "Employer" means the policyholder and includes any division, any subsidiary or any affiliated company named in the policy.
- "Evidence of insurability" means a statement or proof of your medical history upon which we will determine your acceptance for insurance.
- "Gross monthly benefit" means your benefit amount before any reduction for other income benefits and earnings.
- "Home office" means First Unum Life Insurance Company, Christiana Building, Suite 300, 120 White Plains Road, Tarrytown, New York, 10591-5532.
- "Indexed pre-disability earnings" means your basic monthly earnings in effect just prior to the date your disability began adjusted by each percentage adjustment that you are eligible for under the Cost of Living Adjustment provision.
- "Injury" means bodily injury resulting directly from an accident and independently of all other causes. The injury must occur while you are insured and disability must begin within 30 days of the injury. But any disability which begins after the policy terminates will not be covered if you become eligible for coverage under any other group long term disability policy or any other arrangement.
  Exception: Any disability which begins more than 30 days after an injury will be considered a sickness for the purpose of determining benefits under the policy.
- "Monthly benefit" means the amount we will pay you when you are disabled.
- "Physician" means a person who is:
  1. operating within the scope of his license; and either
  2. licensed to practice medicine and prescribe and administer drugs or to perform surgery; or
  3. legally qualified as a medical practitioner and required to be recognized, under the policy for insurance purposes, according to the insurance statutes or the insurance regulations of the governing jurisdiction.
  It will not include you or your spouse, daughter, son, father, mother, sister or brother.

- "Retirement benefits," when used with the term retirement plan, means money which:

  1. is payable under a retirement plan either in a lump sum or in the form of periodic payments;
  2. does not represent contributions made by you (payments which represent your contributions are deemed to be received over your expected remaining life regardless of when such payments are actually received); and
  3. is payable upon:
     a. early or normal retirement; or
     b. disability if the payment does reduce the amount of money which would have been paid at the normal retirement age under the plan if the disability had not occurred.

     Note:  The following early retirement benefits are not considered retirement benefits under the policy:

       i.  those which you receive because the retirement plan compels their receipt; and
       ii. those which reduce the amount of money which would have been paid as retirement benefits at the normal retirement age under the plan.

- "Retirement plan" means a plan which provides your retirement benefits and which is not funded wholly by your contributions.   The term shall not include a profit-sharing plan, a thrift plan, an individual retirement account (IRA), a tax sheltered annuity (TSA), a stock ownership plan, or a non-qualified plan of deferred compensation.

- "Sickness" means illness or disease.  It includes pregnancy unless excluded in the General Exclusions section of this certificate of coverage. Disability must begin while you are insured under the policy.

- "Waiting period," as shown in the plan outline, means the continuous length of time you must serve in an eligible class to reach your eligibility date.

- "You" and "your" means you, the employee.

- "Disability" and "disabled" mean that because of injury or sickness:

  1. you cannot perform each of the material duties of your regular occupation; or

  2. you, while unable to perform all of the material duties of your regular occupation on a full-time basis, are:

     a. performing at least one of the material duties of your regular occupation or another occupation on a part-time or full-time basis; and

     b. earning currently at least 20% less per month than your indexed pre-disability earnings due to that same sickness or injury.

  Note:   For attorneys, "regular occupation" means the specialty in the practice of law which you were practicing just prior to the date the disability started.

## ENROLLMENT AND DATE INSURANCE STARTS

**When can you enroll?**
You can enroll if you are:
1.   in active employment with your employer; and
2.   in a class eligible for insurance.

**When does insurance start?**
Insurance will start at 12:01 a.m. on the day determined as follows, but only if you enroll for insurance with us through your employer on a form satisfactory to us.

1.   If you do not contribute toward the plan's cost, your insurance will start on your eligibility date.

2.   If you do contribute toward the plan's cost, your insurance will start on the latest of these dates:
    a.   your eligibility date.  But you must enroll on or before this date.
    b.   the date you enroll if you do so within 31 days after your eligibility date.
    c.   the date we give approval, if you:
       i.   apply more than 31 days after your eligibility date; or
      ii.   terminated your insurance while still eligible.

    In the case of i.  and ii.  above, you must submit, at your expense, an application and evidence of insurability to us for approval.

But no initial, increased or additional insurance will apply to you if you are not in active employment on the effective date of such insurance because of a disability.  Such insurance will start for you on the day you return to active employment.

## DISABILITY

**When do disability benefits become payable?**
We will pay you a monthly benefit after the end of the elimination period when we receive proof that you:

1.  are disabled due to sickness or injury; and

2.  require the regular attendance of a physician.

**What conditions must be met for benefit payments to continue?**

We will pay you as long as you remain disabled and require the regular attendance of a physician. But we will not pay any longer than the maximum benefit period shown in the plan outline.

Also, you must give us proof of these facts, at your own expense, when we ask for it.

**How is the benefit figured?**
To figure the amount of your monthly benefit:
1.  Multiply your basic monthly earnings by the benefit percentage shown in the plan outline.
2.  Take the lesser of:
    a.  the amount figured in step 1; or
    b.  the maximum monthly benefit shown in the plan outline; and then
3.  Deduct other income benefits from this amount.

But, if you are earning more than 20% of your indexed pre-disability earnings in your regular occupation or another occupation, the following formula will be used to figure the monthly benefit.

$$(A \text{ divided by } B) \times C$$

A = Your "indexed pre-disability earnings" minus your monthly earnings received while you are disabled.
B = Your "indexed pre-disability earnings".
C = The benefit as figured above, but not including adjustments under the Cost of Living Adjustment provision.
The benefit payable will never be less than the minimum monthly benefit shown in the plan outline.

**What are "other income benefits"?**
Other income benefits means those benefits as follows.
1.  The amount for which you are eligible under:
    a.  Workers' or Workmen's Compensation Law;
    b.  occupational disease law; or
    c.  any other act or law of like intent.
2.  The amount of any disability income benefits for which you are eligible under any compulsory benefit act or law.

3.  The amount of any disability income benefits for which you are eligible under:
    a.  any other group insurance plan;
    b.  any governmental retirement system as a result of your job with your employer.
4.  The amount of disability benefits and/or retirement benefits you receive under your employer's retirement plan.
5.  The amount of disability or retirement benefits under the United States Social Security Act, The Canada Pension Plan, or the Quebec Pension Plan, or any similar plan or act, as follows:
    a.  disability benefits for which:
        i.  you are eligible; and
        ii.  your spouse, child or children are eligible because of your disability; or
    b.  retirement benefits received by:
        i.  you; and
        ii.  your spouse, child or children because of your receipt of the retirement benefits.

These other income benefits, except retirement benefits, must be payable as a result of the same disability for which we pay a benefit.

Item 5b will not apply to disabilities which begin after age 70 if you are already receiving Social Security retirement benefits while continuing to work beyond age 70.

Benefits under item 5.a above will be estimated if such benefits:
1.  have not been awarded; and
2.  have not been denied; or
3.  have been denied and the denial is being appealed.

The monthly benefit will be reduced by the estimated amount.   But, these benefits will not be estimated provided that you:
1.  apply for benefits under item 5.a; and
2.  request and sign our Agreement Concerning Benefits.

This agreement states that you promise to repay us any overpayment caused by an award received under item 5.a.  If benefits have been estimated, the monthly benefit will be adjusted when we receive proof:
1.  of the amount awarded; or
2.  that benefits have been denied and the denial is not being appealed.
In the case of 2. directly above, a lump sum refund of the estimated amounts will be made.
"Law", "plan", or "act" means the initial enactment and all amendments.

**What happens if you receive increases in these other income benefits?**
After the first deduction for each of the other income benefits, we will not further reduce your monthly benefit due to any cost of living increases payable under these other income benefits.
**What if you receive a lump sum payment?**
We will prorate other income benefits which are paid in a lump sum on a monthly basis over the time period for which the sum is given.  If no time period is stated, the sum will be prorated on a monthly basis over your expected lifetime as determined by us.
**When do these benefits cease?**
Disability benefits will cease on the earliest of:
1.  the date you are no longer disabled;
2.  the date you die;
3.  the end of the maximum benefit period;
4.  the date your current earnings exceed 80% of your indexed pre-disability earnings.

**Must premium payments be made when you are receiving benefits?**
No, we will waive premium payments during any period for which benefits are payable.

## GENERAL EXCLUSIONS

**What disabilities aren't covered?**
We will not cover any disability due to:
1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries;
3. active participation in a riot.

## PRE-EXISTING CONDITION EXCLUSION

**Are there any other disabilities not covered?**
Yes, we will not cover any disability:
1. caused by, contributed to by, or resulting from a pre-existing condition; and
2. which begins in the first 12 months after your effective date.

"Pre-existing condition" means a sickness or injury for which you received medical treatment, consultation, care or services including diagnostic measures, or had taken prescribed drugs or medicines in the three months prior to your effective date.

# MENTAL ILLNESS LIMITATION

## Are benefits limited for mental illness?

Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless you meet one of these situations.

1.   You are in a hospital or institution at the end of the 24-month period. We will pay the monthly benefit during the confinement.

   If you are still disabled when discharged, we will pay the monthly benefit for a recovery period of up to 90 days.

   If you become reconfined during the recovery period for at least 14 days in a row, we will pay benefits for the confinement and another recovery period up to 90 more days.

2.   You continue to be disabled and become confined:

   a.   after the 24-month period; and
   b.   for at least 14 days in a row.

   We will pay the monthly benefit during the confinement.

We will not pay the monthly benefit beyond the maximum benefit period.

"Hospital" or "institution" means facilities licensed to provide care and treatment for the condition causing your disability.

"Mental illness" means mental, nervous or emotional diseases or disorders of any type.

## COST OF LIVING ADJUSTMENT

**What are the eligibility requirements for cost of living adjustments?**
You will be eligible for cost of living adjustments on the first anniversary of benefit payments and each following anniversary. Adjustments may be made as long as you are receiving benefits.

**By what amount is your benefit adjusted?**
Your net monthly benefit will be increased by 3%.

Each adjustment will be added to your net monthly benefit and will be paid monthly.

**Are the increases subject to the maximum monthly benefit?**
No, cost of living adjustment increases are not subject to the maximum monthly benefit.

**What is the net monthly benefit?**
The net monthly benefit means the amount determined by reducing your amount of insurance by other income benefits and any reductions for earnings. The net monthly benefit will be determined each month. For the purpose of calculating adjustments, the net monthly benefit will include any prior years' cost of living adjustments.

## TERMINATION

**When does your insurance terminate?**

You will cease to be insured on the earliest of the following dates:

1. the date the policy terminates;
2. the date you are no longer in an eligible class;
3. the date your class is no longer included for insurance;
4. the last day for which you made any required employee contribution;
5. the date employment terminates.   Cessation of active employment will be deemed termination of employment, except:
   a. if you are disabled your insurance will be continued during:
      i.   the elimination period; and
      ii.  the period during which premium is being waived.
   b. your employer may continue your insurance by paying the required premium, subject to the following.
      i.   Insurance may be continued for the time shown in the plan outline if you are:
         ai.  temporarily laid off; or
         aii. given leave of absence.
      ii.  The employer must act so as not to discriminate unfairly among employees in similar situations.

## CONVERSION PRIVILEGE

**Under what conditions can you convert?**
When your insurance under this plan terminates because you end employment with the policyholder, you may obtain converted disability income coverage without medical evidence of insurability. But you must have been insured for at least twelve consecutive months just before your insurance under this plan terminated. These twelve months will be considered to include the time you were insured for group long term disability under both this plan and the one it replaced, if any.

**Who may not convert?**
The conversion privilege is not available to you if:

1. your insurance under this plan terminates for any of the following reasons:
   a. this plan terminates;
   b. this plan is amended to exclude from coverage the class of employees to which you belong;
   c. you no longer belong to a class of employees eligible for coverage under this plan;
   d. you retire;
   e. you failed to pay any required premium;
2. you are or become insured for long term disability insurance under another group plan within 31 days after termination; or
3. you are disabled under the terms of this plan.

**When must you apply for the conversion coverage?**
You must apply for and pay the first quarterly premium for the conversion coverage within 31 days after your insurance terminates under this plan.

**Is the conversion coverage the same as that provided under this plan?**
The Company governs the form of coverage, the benefits and the amounts. The benefits and amounts may differ from those under this plan.

## SOME GENERAL INFORMATION TO KNOW

**When must we be notified of a claim?**
You must give us written notice of claim within 30 days of the date disability starts. If that is not possible, you must notify us as soon as you can.
When we receive your written notice of claim, we will send you our claim forms. If you do not receive the forms within 15 days after you sent the notice, you can send written proof of claim without waiting for the form.

**When does proof of claim have to be given?**
You must give us proof of claim no later than 90 days after the end of the elimination period.
If it is not possible for you to give proof within these time limits, it must be given as soon as reasonably possible.
You must give us proof of continued disability and regular attendance of a physician within 45 days of the date we request the proof.
The proof must cover:
1. the date disability started;
2. the cause of disability; and
3. how serious the disability is.

**When are claims paid?**
When we receive proof of claim, benefits payable under the policy will be paid monthly during any period for which we are liable.

**Who are claims paid to?**
All benefits are payable to you. But if a benefit is payable to your estate, or if you are a minor, or you are not competent, we have the right to pay up to $1,000 to any of your relatives whom we consider entitled. If we pay benefits in good faith to a relative, we will not have to pay such benefits again.

**What are our examination rights?**
We, at our expense, have the right and opportunity to have you examined by a physician or vocational expert of our choice to determine the extent of any sickness or injury for which you have made a claim. This right may be used as often as reasonably required.

**How can statements made in any application for this insurance be used?**
In the absence of fraud, all statements you made when applying for this insurance and providing evidence of insurability are considered representations and not warranties (absolute guarantees). No statements by you will be used to reduce or deny a claim unless a copy of your statements has been given to you.

**Can legal proceedings be started at any time?**
No, you or your authorized representative cannot start any legal action:
1.  until 60 days after proof of claim has been given; nor
2.  more than 3 years after the time proof of claim is required.

**What happens if facts are misstated?**
If relevant facts about you were not accurate:
1.  a fair adjustment of premium will be made; and
2.  the true facts will decide if and in what amount insurance is valid.

**Does this coverage affect workers' or workmen's compensation?**
The policy is not in lieu of, and does not affect, any requirement for coverage by workers' or workmen's compensation insurance.

# ERISA

## Additional Summary Plan Description Information

**Name of Plan:**
    ANDERSON KILL & OLICK, P.C.
    ANDERSON KILL & OLICK, L.L.P.
    ANDERSON KILL & OLOCK

**Name and Address of Employer:**
    ANDERSON KILL & OLICK, P.C.
    ANDERSON KILL & OLICK, L.L.P.
    ANDERSON KILL & OLICK
    1251 Avenue of the Americas
    New York, NY  10020

**Plan Identification Number:**
    a.  Employer IRS Identification No.:  13-2743351
    b.  Washington Partnership
        Employer IRS Identification No.:  22-2269320
    c.  Plan #:  502

**Type of Welfare Plan:**
Disability

**Type of Administration:**
The Plan is administered by the Plan Administrator.  Benefits are administered by the insurer and provided in accordance with the policy issued to the Plan.

**ERISA Plan Year Ends:** December 31st

**Plan Administrator, Name, Address and Telephone No.:**
    ANDERSON KILL & OLICK, P.C.
    1251 Avenue of the Americas
    New York, NY  10020
    (212) 278-1000

Washington Partnership
    2000 Pennsylvania Avenue, N.W.
    Washington, DC  20006
    (202) 728-3199

ANDERSON KILL & OLICK, P.C. and ANDERSON KILL & OLICK, L.L.P. (Washington Partnership) is the Plan Administrator and named fiduciary of the Plan, with authority to delegate its duties.  The Plan Administrator may designate Trustees of the Plan, in which case the Administrator will advise you separately of the name, title and address of each Trustee.

**Agent for Service of Legal Process on the Plan:**
    Same as above

Service of legal process may also be made upon the Plan Administrator, and any Trustee of the Plan.

**Funding and Contributions:**

The Plan is funded as an insured plan under policy number 43738 issued by First Unum Life Insurance Company, 99 Park Avenue, 6th Floor, New York, New York 10016. Contributions to the plan are made as stated under **"Contributions"** in the Certificate of Coverage.

## EMPLOYER'S RIGHT TO AMEND THE PLAN

The Employer reserves the right, in its sole and absolute discretion, to amend, modify, or terminate, in whole or in part, any or all of the provisions of this Plan (including any related documents and underlying policies), at any time and for any reason or no reason. Any amendment, modification, or termination must be in writing and endorsed on or attached to the Plan.

## EMPLOYER'S RIGHT TO REQUEST A POLICY CHANGE

The Employer may request a policy change. Only an officer or registrar of the insurance company can approve a change. The change must be in in writing and endorsed on or attached to the policy.

## YOUR RIGHTS IN THE EVENT OF PLAN TERMINATION

Termination of the policy under any conditions will not prejudice any payable claim which occurs while this plan is in force.

## THE PLAN MAY TERMINATE

1. If the policyholder fails to pay any premium within the grace period, the policy will automatically terminate at 12:00 midnight of the last day of the grace period. The "grace period" is the &XGI011. days following a premium due date during which premium payment may be paid.

2. The policyholder may terminate the policy by advance written notice delivered to the insurance company at least 31 days prior to the termination date. But the policy will not terminate during any period for which premium has been paid.

3. The insurance company may terminate the policy on any premium due date by giving written notice to the policyholder at least 31 days in advance if:

   a. The number of employees insured is less than 10; or

   b. Less than 100% of the employees eligible for any noncontributory insurance are insured for it; or

   c. Less than 75% of the employees eligible for any contributory insurance are insured for it; or

   d. The policyholder fails:

      i. To furnish promptly any information which the insurance company may reasonably require; or

      ii. To perform any other obligations pertaining to the policy.

4. Termination may take effect on any earlier date when both the policyholder and the insurance company agree.

## CLAIMS PROCEDURES

The insurance company will give you notice of the decision no later than 45 days after the claim is filed. This time period may be extended twice by 30 days if the insurance company both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies you of the circumstances requiring the extension of time and the date by which the insurance company expects to render a decision. If such an extension is nec-

essary due to your failure to submit the information necessary to decide the claim, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice within which to provide the specified information. If you deliver the requested information within the time specified, any 30 day extension period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, the insurance company may decide your claim without that information.

If your claim for benefits is wholly or partially denied, the notice of adverse benefit determinations under the Plan will:

1.  state the specific reason(s) for determination;

2.  reference the specific Plan provision(s) on which the determination is based;

3.  describe additional material or information necessary to complete the claim and why such information is necessary;

4.  describe Plan procedures and time limits for appealing the determination, and your right to obtain information about those procedures and the right to sue in federal court; and

5.  disclose any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or state that such information will be provided free of charge upon request).

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

**APPEAL PROCEDURES**

You have 180 days from the receipt of notice of an adverse benefit determination to file an appeal. Requests for appeals should be sent to the address specified in the claim denial. A decision on review will be made not later than 45 days following receipt of the written request for review. If the insurance company determines that special circumstances require an extension of time for a decision on review, the review period may be extended by an additional 45 days (90 days in total). The insurance company will notify you in writing if an additional 45 day extension is needed.

If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice to provide the specified information. If you deliver the requested information within the time specified, the 45 day extension of the appeal period will begin after you have provided that information. If you fail to deliver the requested information within the time specified, the insurance company may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal. You will have access to all relevant documents as defined by applicable U. S. Department of Labor regulations. The review of the adverse benefit determination will take into account all new information, whether or not presented or available at the initial determination. No deference will be afforded to the initial determination.

The review will be conducted by the insurance company and will be made by a person different from the person who made the initial determination and such person will not be the original decisionmaker's subordinate. In the case of a claim denied on the grounds of a medical judgement, the insurance company will consult with a health professional with appropriate training and experience. The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination or a subordinate. If the advice of a medical or vocational expert was obtained by the Plan in

connection with the denial of your claims, the insurance company will provide you with the names of each such expert, regardless of whether the advice was relied upon.

A notice that your request on appeal is denied will contain the following information:

1. the specific reason(s) for determination;

2. a reference to the specific Plan provision(s) on which the determination is based;

3. a statement disclosing any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination (or a statement that such information will be provided free of charge upon request);

4. a statement describing your right to bring a civil suit under federal law;

5. the statement that you are entitled to receive upon request, and without charge, reasonable access to or copies of all documents, records or other information relevant to the determination; and

6. the statement that "You or your plan may have other voluntary alternative dispute resolution options, such as mediation,  One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency".

Notice of the determination may be provided in written or electronic form. Electronic notices will be provided in a form that complies with any applicable legal requirements.

Unless there are special circustances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

### YOUR RIGHTS UNDER ERISA

As a participant in this Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides all Plan participants shall be entitled to:

### Receive Information About Your Plan and Benefits

Examine, without charge, at the Plan Administrator's office and at other specified locations, all documents governing the Plan, including insurance contracts, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated summary plan desciption.   The Plan Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report.   The Plan Administrator is required by law to furnish each participant with a copy of this summary annual report.

### Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.  No one, including your employer or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

**Assistance With Your Questions**

If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should contact the nearest office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsiblities under ERISA by calling the publications hotline of the Pension and Welfare Benefits Administration.

## DISCRETIONARY ACTS

In exercising its discreationary powers under the Plan, the Plan Administrator, and any designee (which shall include the insurance company as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator, or its designee (including the insurance company), decides in its discretion that the applicant is entitled to them.

# EXHIBIT B

Unum
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unum.com



July 11, 2012

JAMES FLANDREAU
320 WEST FRONT STREET
MEDIA, PA 19063

RE:    Miller, Virginia Irene          DOB: June 22, 1965
       Claim Number:                    5768254
       Policy Number:                   43738
       First Unum Life Insurance Company

Dear Attorney Flandreau:

I tried to reach you by phone on July 11, 2012 to discuss our decision on your client's Long Term disability claim.  After completing its review of her disability claim, First Unum Life Insurance Company is sorry to inform your client that it is unable to continue paying benefits.

As you may know, the policy under which we have been providing benefits has a limitation that states:

"Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations:

1.  The insured is in a hospital or institution at the end of the 24 month period.  The monthly benefit will be paid during the confinement.

    If the insured is still disabled when he is discharged, the monthly benefit will be paid for a recovery period of up to 90 days.

    If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2.  The insured continues to be disabled and becomes confined:
    a.  after the 24 month period; and
    b.  for at least 14 days in a row.

    The monthly benefit will be payable during the confinement.

    The monthly benefit will not be payable beyond the maximum benefit."

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

July 11, 2012
Page 2 of 4

In addition this policy states:

"'Disability' and 'disabled' mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; or
2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
   a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
   b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness."

"The Company, at its own expense, will have the right and opportunity to have an employee, whose injury or sickness is the basis of a claim, examined by a physician, other health professional, or vocational expert of its choice.  This right may be used as often as reasonably required."

We have had your client's entire medical file reviewed to determine if she had any other medical conditions that would continue to keep her from performing the material and substantial duties of her own occupation at the end of the Mental and Nervous limitation.  Her file in its entirety was reviewed by a physician board certified in psychology and neurology.

He reviewed all of your client's medical records from Drs. Woods, Wallack, Segal, Lawler and Remed Rehabilitation facility.  He also reviewed the restrictions and limitations of Dr. Woods (Patient is unable to work – 04/19/12) and Dr. Wallack (Unable to practice law, history of traumatic encephalopathy).

Your client was diagnosed with post concussive syndrome with cognitive impairment.  She has co morbid conditions of migraine and depression.

She had a mild head injury on August 25, 2009 that may have caused a momentary loss of consciousness.  She did not seek care until that following day and all test results were normal.  She continued to work for an additional four months before she left work for reportedly cognitive symptoms.

Your client has never had an abnormal neurologic examination.  Her first neuropsychological testing did not include tests of personality assessment and emotional status.  Her second neuropsychological independent medical examination demonstrated no evidence of significant cognitive compromise and the diagnosis was somatization disorder and status post mild concussion.

The mild severity of the reported head injury without significant loss of consciousness, negative early CT brain scan, inordinately prolonged symptoms and subsequent normal neurologic examinations are inconsistent with a physical basis for your client's reported persistent cognitive complaints.  Full, or near full, recovery within 3-6 months following mild/moderate concussion would be expected.  Also, as noted, the formal neuropsychological test findings are also inconsistent with a physical basis for the insured's physical symptoms.

No one is opining any restrictions or limitations as a result of your client's diagnoses of migraines or depression at this time.

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

July 11, 2012
Page 3 of 4

Our physician contacted both Dr. Woods and Dr. Wallack to discuss their restrictions and limitations. Dr. Woods declined to respond to our physician's request for discussion and Dr. Wallack re-stated his opinion.

We then had your client's file reviewed by another physician, board certified in family and occupational medicine. He noted that there is no physical basis for a significant neurological injury that would preclude your client from performing activities after July 5, 2012 such as frequent sustained concentration, social interaction, adaptation, understanding and memory, influencing people, performing a variety of duties and making judgments and decisions. He noted that she should also be able to lift up to 10 pounds on an occasional basis and to sit frequently. Neither Dr. Wallack nor Dr. Woods have documented any evidence of muscle weakness, incoordination, limited range of joint motion, or other conditions that would preclude your client from performing the material and substantial duties of her own occupation.

Because this claim is subject to this limitation and we have now provided 24 months of benefits, and there is no physical basis for a condition which would impact your client's functional capacity, we stopped paying benefits on this claim as of July 05, 2012.

The maximum benefits under the Mental Illness provision have been paid as of July 05, 2012 and this claim has been closed effective July 06, 2012.

**Next Steps Available to You**

If you disagree with our decision, you have the right to request an appeal.

**What is an Appeal?**

An appeal is your written disagreement with our claim decision and a request for a review of that decision.

**How do you request an Appeal?**

You will need to submit a written letter of appeal outlining the basis for your disagreement. To ensure handling of your appeal without delay, please include any additional information you would like considered. This information may include written comments, documents, or other information in support of your appeal.

**What information is available to you?**

Upon your written request, we will provide you with all documents, records and other information relevant to your claim for benefits.

**How much time do you have to request an Appeal?**

You have 180 days from the date you receive this letter.

If we do not receive your written appeal within 180 days of the date you receive this letter, our claim determination will be final.

**Where do you mail or fax your written request for an Appeal?**

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

July 11, 2012
Page 4 of 4

The Benefits Center
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Fax Number: 1-207-575-2354

Our Appeals Unit will send you a letter acknowledging receipt of your appeal including your
Appeals Specialist's contact information.

**How does the Appeal process work?**

An Appeals Specialist will review your entire claim, including any new information you submitted
and may consult medical and vocational experts or other resources. The Appeal Specialist will
make an independent decision on your claim.

**How much time does the Appeal review take?**

We are committed to making an appeal decision within 45 days after we receive your written
appeal. There may be special circumstances in which the review can take longer. We will
notify you if more time is needed.

**What if you continue to disagree with the determination after the appeal is decided?**

You will have the right to have a court review the appeal determination by bringing a civil action
under section 502(a) of the Employee Retirement Income Security Act (ERISA).

We have not evaluated your claim with respect to any policy provisions other than those
discussed above. The Company reserves its right to enforce all provisions of the policy.

Mr. Flandreau, if you have any questions please contact me at 1-800-858-6843, extension
51291.

Sincerely,

*Ann Liller*

Ann Liller for Heather Standish Levesque
Senior Disability Benefits Specialist


CC:          Virginia Miller (without enclosures)

# EXHIBIT C

Unum
The Benefits Center
PO Box 100158
Columbia, SC 29202-3158
Phone: 1-800-858-6843
Fax: 1-800-447-2498
www.unum.com



August 20, 2012

JAMES FLANDREAU
320 WEST FRONT STREET
MEDIA, PA 19063

RE:   Miller, Virginia Irene       DOB: June 22, 1965
       Claim Number:              5768254
       Policy Number:             43738
       First Unum Life Insurance Company

Dear Attorney Flandreau:

We have reviewed the additional information that was recently sent to us regarding your client's Long Term Disability claim.  We regret this information was not sufficient to reverse our previous decision.

Please read the following pages carefully, as they will help you understand how we reached this decision.

This letter includes the following:

- The decision/reason

- Information that supports our decision

- Next steps available

- Provisions outlined in your client's employer's disability policy

I am available to review in detail the information we have and how this decision was made.  You can reach me at 1-800-858-6843, extension 53396.

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

August 20, 2012
Page 2 of 3

**Decision/Reason:**

The new information received does not change our prior decision.

**Information That Supports Our Decision**

- After your client's claim was closed we received a response from Dr. Woods. Dr. Woods did not provide any additional information he only reiterated his opinion that Virginia Miller does not have work capacity.
- The information does not provide our prior assessment.

**Next Steps Available To You:**

When this information was submitted, you did not state you wished to appeal the claim decision for Virginia Miller. If you would like to appeal this decision please submit a written appeal by January 07, 2013 as noted in our letter dated July 11, 2012.

**Policy Provisions:**

The following provisions are applicable to our claim decision.

Your policy through your employer defines disability as follows:

"'Disability' and 'disabled' mean that because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; and
2. the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
   a. performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
   b. earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

Note: for attorneys, 'regular occupation' means the specialty in the practice of law which the insured was practicing just prior to the date disability started."

007 0 0005768254 01752 0

00006113

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

August 20, 2012
Page 3 of 3

Attorney Flandreau, if you have any questions, please feel free to contact me toll-free at 1-800-858-6843, extension 51291.

Sincerely,

*Heather Standish Levesque*

Heather Standish Levesque
Senior Disability Benefits Specialist


Enclosures:     -Claimant: Decision
CC:             Virginia Miller (without enclosures)



# EXHIBIT D

# PAUL, FLANDREAU & BERGER, LLP

Attorneys At Law
320 WEST FRONT STREET
MEDIA, PENNSYLVANIA 19063
www.pfblaw.com

EDWARD R. PAUL
JAMES R. FLANDREAU
TIMOTHY A. BERGER
DENISE E. MURRAY

(610) 565-4750
FAX (610) 565-5294

OF COUNSEL
PETER A. MARDINLY *
*MASTER OF LAWS (TAXATION)

December 31, 2012
**By fax**

The Benefits Center
Appeals Unit
P.O. Box 9548
Portland, ME 0104-5058

Re:    Virginia Miller  v. Anderson, Kill & Olick, P.C.
       Claim Number 5768254
       Policy Number 43738

Dear Sir/Madam:

We represent Virginia Miller, and are writing to appeal the July 11, 2012 determination of the Senior Disability Benefits Specialist that ended Ms. Miller's benefits as of July 5, 2012.

Kindly provide a full and complete copy of the administrative record.

In support of the appeal, I enclose the following:

1. Report of Separation and Record of Service effective 8/18/11;
2. REMED Physical Therapy Evaluation dated 10/20.

We reserve the right to submit additional records and evidence once we have reviewed the administrative record.

The July 11, 2012 determination turns substantially on the conclusion of the Benefits Specialist that Ms. Miller is suffering from mental illness rather than from post-concussion syndrome.  Benefits for mental illness are limited to 24 months unless she is hospitalized or confined at the end of the 24 month period.

The conclusion of the Benefits Specialist ignores the following evidence that is already in your file that establishes that Ms. Miller suffers from post-concussion syndrome, and that her disability is **not** the result of a mental illness:

The Benefits Center
December 31, 2012
Page 2

1.  Dr. Woods' note dated 10/1/10 documenting Ms. Miller's ongoing severe migraine
    headaches and a diagnosis of post-concussion cognitive impairment;

2.  Dr. Wallack's note dated 4/5/10 noting Ms. Miller's difficulty during
    neuropsychological testing on February 9, 2010;

3.  Dr. Wallack's note dated 10/5/10 documenting Claimant's ongoing physical therapy
    and speech therapy, along with her need for medication to treat migraine headaches;

4.  Neuropsychological Evaluation test report dated 2/9/10 noting that Ms. Miller's
    prolonged recovery and the persistence of several post concussion symptoms,
    including slow motor speed and weak verbal fluency, could be due, at least in part, to
    the fact that this was her third concussion.

The Benefits Specialist's statement that Ms. Miller worked for four months after the
injury is not entirely correct. Although Ms. Miller attempted to work in the months following
her injury, she was forced to reduce both her hours and her case load due to the cognitive
difficulties she was experiencing. This was upon the orders of her treating physicians and upon
review of her employer.

The policy's definition of "Disability" is that "the insured cannot perform each of the
material duties of his regular occupation." Ms. Miller has been evaluated by numerous
physicians who have determined that she has difficulty with concentration, verbal skills and
memory, in addition to severe migraine headaches. The Remed physical therapy evaluation
noted that she fatigues easily and has limited tolerance in high stimulus situations. Although Ms.
Miller may test higher than some individuals with similar injuries, her regular occupation as an
attorney is a high stimulus situation and requires greater cognitive abilities than the general
work-force population. Given her fatiguability and migraines,

The determination also ignores the fact that as a result of her injuries, Ms. Miller was
separated from the Air National Guard. The Report of Separation and Record of Service reveals
that she joined the Air National Guard in December, 1989. At the time of her injury, she was a
member of the 193rd Special Operations Squadron with the rank of Lieutenant Colonel. She flew
and was the Flight Systems Officer and Flight Leader for C130 planes. As part of those duties,
she planned commando solo tactical employments, participated in aerial refueling, and managed
the flight crew. She participated in Enduring Freedom and flew in and out of active war zones.
She was awarded numerous medals and ribbons, including awards for outstanding aeronautical
achievement, as well as her combat medals. Ms. Miller was honorably discharged due to
**physical** – not mental -- disqualifications as a result of her injury. Accordingly, her medical
discharge from long military service due to her physical condition only serves to reinforce the
conclusion that she suffers from physical disabilities rather than mental illness.

The Benefits Center
December 31, 2012
Page 3


     Ms. Miller continues to treat with Dr. Woods and Dr. Wallack; in light of the tenor of the July 11, 2012 disability determination, we expect that when we receive and review the administrative record, we will discover significant gaps in the records that have skewed the available information and the resulting determination.  We will supply updated records once we have determined the extent of what is already in the record.

     We therefore disagree that with the determination that Ms. Miller is no longer disabled, and believe that she is entitled to ongoing benefits under the policy.  Further, we disagree with the determination that Ms. Miller is suffering from a mental illness rather than the documented physical injury of post-concussive syndrome.  The records, including the administrative record, accordingly establish that the Benefits Specialist erred to the extent that benefits were terminated as of July 6, 2012.

Very truly yours,

JAMES R. FLANDREAU

JRF:clk
Encl.
cc: Virginia Miller

# EXHIBIT E

Unum
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Phone: 1-800-413-7670
Fax: 207-575-2354
www.unum.com



May 3, 2013

JAMES FLANDREAU
320 WEST FRONT STREET
MEDIA, PA 19063

RE:    Miller, Virginia Irene          DOB: June 22, 1965
       Claim Number:                   5768254
       Policy Number:                  43738
       First Unum Life Insurance Company

Dear Attorney Flandreau:

First Unum Life Insurance Company has completed the appeal review on your client, Virginia Miller's Long Term Disability claim.

Please read the following pages carefully, as they will help you understand how we reached our decision.

This letter includes the following:

- Initial Claim Decision

- The Appeal Decision

- Information that supports the Appeal Decision

- Our Response to your Concern(s)

- Policy Provisions that apply to the Appeal Decision

- Next steps available to you

If you would like me to review with you the information we have and how this decision was made, please call me at 1-800-413-7670, extension 55740.

1242-03        UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

**Initial Claim Decision:**

The Benefits Center concluded your client's disability is due to mental illness. Benefits are limited to 24 months for this type of condition. The maximum duration of benefits was paid as of July 5, 2012. It was also determined there is no physical basis for a condition that would affect her functional capacity.  Her claim was closed as of July 6, 2012.

**Appeal Decision:**

We have determined that the decision on Ms. Miller's claim is correct.

**Information that Supports our Decision:**

We received Ms. Miller's claim in May 2010 with a claimed disability date of January 7, 2010.

Ms. Miller reports she fell on August 25, 2009, suffered a concussion which resulted in post-concussive syndrome. She is unable to perform her occupational duties as a Litigation Attorney.

We have reviewed medical records and work statements from the following:

Dr. Eliot Wallack, neurology
Dr. Miriam Segal, psychiatrist
Terri Morris, PhD, neuropsychologist
Edward Maitz, PhD, neuropsychologist
Kathy Lawler, PhD, neuropsychologist
Dr. Timothy Woods, primary care
Susan Martin-White, physical therapist
Rehabilitation records (speech/cognitive, OT/PT)
Emergency room records
University of Penn Medical Center
Military service medical records
Hershey Medical Center

We asked a physician board certified in neurology and a licensed psychologist to review this information.

Our review does not support restrictions or limitations that would prevent your client from working.

**Neurological considerations:**

Our reviewing neurologist concludes the medical evidence does not support Ms. Miller suffered a TBI (traumatic brain injury) severe enough to produce her reported symptoms. Ms. Miller reports residual symptoms of:

- A decrease in concentration;
- Impaired short term memory;
- Word finding difficulty;
- Decreased ability to multi-task;
- Decreased mood;
- Headaches.

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

May 3, 2013
Page 3 of 11

Our physician notes the medical records most proximate in time to the fall provide the most clinically relevant data. The emergency room records on August 26, 2009, note the following:

- Her chief complaint on August 26, 2009, the day after the fall, was wrist pain.
- In the documentation, Ms. Miller's description of hitting the left side of her face and forehead on the ground is mentioned as an afterthought. This followed the description of falling on her right wrist and bilateral knees.
- She did not report a loss of consciousness, lightheadedness, or dizziness on the day after the fall.
- She denied visual changes the day after the fall.
- Ms. Miller did report headache with slight nausea the day after the fall. However, there is no documentation of actual vomiting.
- She denied ataxia or fear of falling during this emergency room visit.

## Emergency room exams

The physical exams on August 26, 2009, and subsequent visit on August 31, 2009, do not provide documentation by any medical professional of:

- Abrasions;
- Bruising;
- Hematoma;
- Tenderness of the head;
- Drowsiness or agitation.

The emergency room records do document:

- Normal gait;
- Normal mental status;
- Nursing staff documented Ms. Miller understood the discharge orders.

## Diagnostics

- On August 31, 2009, the CT brain report document the radiologist is on notice the scan is obtained to assess for trauma.
- There is no note of sub-cutaneous swelling above the eye.
- No evidence of intracranial hemorrhage or subtle cerebral edema.

## Cognitive impairment/neuropsychological testing:

We asked a licensed psychologist to complete a review. The purpose of this review was to determine if the medical evidence supports cognitive impairment consistent with a TBI.

Ms. Miller underwent neuropsychological evaluations on February 9, 2010, June 15, 2011, June 22, 2011, September 16, 2011, and September 22, 2011. The evaluations note the following:

## Dr. Kathy Lawler February 9, 2010-

- Dr. Lawler recorded Ms. Miller's history of "concussion in late August of 2009 when she fell and hit her forehead."

- Ms. Miller "described feeling fuzzy after the fall and stated that she was not thinking right."
- Ms. Miller reported nausea and visual problems the next morning. She reported being seen in the emergency department.
- Ms. Miller reported she "began to experience headaches and continued to have difficulty with her vision."
- Dr. Lawler noted a brain MRI revealed no abnormalities. A neurological workup started on September 30, 2009, resulted in diagnosis of "closed head trauma with an episode of mild confusion and subsequent persistent headache and cognitive difficulties."
- Ms. Miller reported "gradual improvement in post-concussion symptoms." She still had "mild cognitive difficulties" with working memory, attention to details, multi-tasking, word finding, and mixing up work order. She frequently lost her "trend of thought" and "often feels like she is in a fog."
- Ms. Miller reported she has tried to avoid driving due to difficulty with focusing and being bothered by glare of lights at night.
- She described herself as having a type A personality and feeling "slightly more irritability and frustrated" and "semi-depressed at times" since the concussion. She reported sleep disturbance for which she was taking clonozapam.
- Dr. Lawler concluded "the current neuropsychological evaluation documented variability in Ms. Miller's cognitive functioning. Overall, her speed was slow bilaterally on a measure of fine motor speed and dexterity. Her slowness may have contributed to her low scores on several tests.
- Memory skills were within normal range or higher, with the exception of one measure of visual recall. Processing speed was excellent. She had a tendency to sacrifice accuracy for speed. Language functions were generally intact, but verbal fluency was relatively weak.
- She demonstrated a normal range of affect, but endorsed moderate symptoms of depression and mild symptoms of anxiety.
- Dr. Lawler thought the "fact that this is her third concussion might be contributing to her somewhat prolonged recovery and the persistence of several post concussion symptoms" but "expected her cognition will continue to gradually improve over the next few weeks."
- Recommendations included: short-term psychotherapy for expressed depression/frustration, education about sleep hygiene since poor sleep could be a contributing factor, and remain on medical leave until planned return to work in March.

Dr. Christopher King reportedly conducted a NP IME on April 8, 2011. Ms. Miller's individual disability carrier, The Hartford, requested these. These reports and associated raw test data are not available for review. His conclusions are summarized in Dr. Morris' report.

### Dr. Edward Maitz September 16, 2011, September 22, 2011-Unum NP IME

- Dr. Maitz recorded Ms. Miller's report of injury in a fall on October 25, 2009. She reported "she was leaving her office and on her way to catch a train when her foot caught in a loose paver, which 'acted like a fulcrum.' Her next memory was 'lying on my back and then people telling me not to move."
- Ms. Miller reported having "a knot" above her right eye and felt "dazed and confused."
- She reports the police arrived at the scene and told her an ambulance was on the way" but she responded she "did not think that she needed to go to the hospital. She was assisted back to her office and eventually took a cab home."
- She told Dr. Maitz she "could not remember how she felt." This was in response to his question about how she felt the remainder of the day. She reported "she awoke the next morning feeling 'really awful.' She reported a headache with nausea. She again reported feeling 'dazed and confused.' She described her balance as 'off.'"

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

May 3, 2013
Page 5 of 11

- She noted concerns for her right wrist. She took a train and then a taxi to the emergency department. She was treated and discharged the same day.
- She reported "she was nauseated and vomited in the emergency department." It was her opinion "she sustained a traumatic brain injury, sprained right wrist, and bruises to one or both knees in the fall."
- She reported headaches were initially daily. She reported resolved symptoms included "difficulty judging the speed and direction of moving objects for some time after the fall..." and change in menstrual cycle. She has longstanding service-connected hearing loss in her left ear.

Ongoing cognitive symptoms reported by Ms. Miller post fall include:

- Weekly headaches increased to daily. This was over the past two or three months. They were medication related; other head pain from tension/stress;
- Persistent dizziness that varies in frequency and severity. It is associated with residual symptoms of fatigue, unsteadiness, and "lack of cognitive clarity"; occurs when she becomes "overwhelmed overloaded"; reportedly due to vestibular disorder for which she is being treated at ReMed;
- Persistent photosensitivity that had "diminished over time" but she was still working on it at ReMed by "gradually increasing ambient light";
- Mild hyperacusis for which she reports wearing earplugs particularly when in crowds;
- Imbalance;
- "Transient" sleep issues. Sleep has increased from six to 10 hours a night;
- Decreased libido;
- Difficulty with focus/concentration/memory and "she takes 'two steps forward then three steps back' particularly if she becomes 'overloaded or overwhelmed'";
- "Can get disoriented and almost not know where I am";
- Difficulty recognizing familiar faces including her doctor who lives near her;
- Difficulty driving even in familiar places and relies on GPS;
- Difficulty with word finding and mispronouncing written words.

Concerning Ms. Miller's emotional status she reports she was "depressed for a while' because she 'went through a lot of life changes." She reported episodes of anxiety and feeling mildly irritable plus frustrated "with this brain injury."

She reports taking Celexa medication for about six months but stopped it two weeks prior to the September 16, 2011, evaluation. She could not recall the prescribing physician. She reported being seen in weekly to every other week psychotherapy with Dr. Bond since November 2010.

Dr. Maitz detailed numerous observed behaviors during the IME. These included Ms. Miller wearing sunglasses during the interview/testing, and requesting the lights be dimmed due to reported photosensitivity.

She did not maintain eye contact and had "exceedingly slow" rate of speech and response time; as well as required prompt for response times. She was noted to have "marked difficulty" with word finding and communication such as describing office lights "pocket lights" and asking the examiner to "put them down."

Dr. Maitz noted the testing by Dr. Lawler found "variability in Ms. Miller's cognitive functioning." Dr. Maitz added "in fact, from a cognitive perspective, Ms. Miller's scores were found to be

within normal limits with the exception of her scores on one test of visual memory, visual perceptual errors, and mild relative difficulty with verbal fluency."

Dr. Maitz noted Dr. Lawler diagnosed concussion but did not recommend cognitive remediation therapy. She supported Ms. Miller's plan to return to work on a part-time basis. Dr. Maitz also noted Dr. Segal, her psychiatrist initially diagnosed traumatic brain injury then concussion and then a closed head injury. The ReMed staff diagnosed traumatic brain injury.

Dr. Maitz indicated if Ms. Miller "did sustain a concussion in the fall, it was relatively mild in nature, given that there was no evidence of abnormality on neuro-imaging studies, no documented neurocognitive impairment on neurologic assessment, and only mild variability on formal neuropsychological testing."

Dr. Maitz noted Ms. Miller "returned to what she described as a very difficult and demanding job as a trial attorney." He explained she worked fewer hours and reported difficulty performing her job but also reported "no substantial decrease in her income and that she earned bonuses at work."

He added, "despite the fact that Ms. Miller returned to work and was earning the same income that she was prior to her accident, her physicians completed disability forms indicating Ms. Miller was vocationally disabled." Her physicians cited the findings from Dr. Lawler's evaluation to support their conclusions. However, there is no indication Dr. Lawler was of the opinion Ms. Miller had cognitive deficits that rendered her vocationally disabled.

Dr. Maitz noted findings from the September 2011 NP IME compared with Dr. Lawler's prior NP exam "revealed some variability within and between evaluations. Ms. Miller performed worse on some of the tests on the current evaluation than she did on Dr. Lawler's evaluation. Dr. Maitz concludes this is not consistent with the typical course of recovery following a cerebral concussion. He further notes it is not his opinion that Ms. Miller was in any way malingering or exaggerating her deficits. However, it is his opinion; the areas of impairment that were evident on the September 2011 NP evaluation are not due to the effects of a cerebral concussion or mild TBI.

Dr. Maitz found "they are due to the interaction of other non-brain related factors including headache pain and possible side effects of her medications (by her self-report), and interference from significant psychological and emotional issues that impact Ms. Miller's functioning."

He also concluded the raw test data was "consistent with individuals who develop somatic complaints in response to stress." He indicated she endorsed only mild symptoms of anxiety and depression but experienced "significantly more emotional upset than she is able and/or willing to admit." His diagnostic impression was Somatization Disorder on Axis I with GAF (global assessment of functioning) of 60.

Dr. Maitz explained Ms. Miller's report of headache pain and "cognitive sluggishness" due to medication side effects were "subjective." As a neuropsychologist, he was not able to provide an opinion about nature, severity, or etiology of the headaches or side effects of medications.

He did note Ms. Miller "is experiencing significant psychological and emotional problems that contribute to her mild cognitive difficulties." He thought she "demonstrates mild limitations due to psychological factors stemming from a Somatization Disorder" and "these limitations will likely result in her sometimes being unable to quickly process information and maintain conversation

or social interaction at a normal pace." He also thought she "will likely make visual/perceptual errors when working at a rapid pace."

### Dr. Terri Morris December 7, 2011 NP testing-

- You referred your client to Dr. Morris for a NP evaluation.
- Dr. Morris determined Ms. Miller's "history, reported symptoms, and neuropsychological profile are consistent with traumatic brain injury (TBI), which, within reasonable neuropsychological certainty, is a result of a fall on August 25, 2009."
- At the time of this evaluation Ms. Miller was two years post injury. Dr. Morris noted her progress has reached a plateau and residual deficits on this exam are permanent.
- He notes due to the types of deficits, notably memory and executive functions, effects can be, and often are substantial. This is due to their impact on patients being able to accomplish daily tasks effectively and/or maintain emotional or behavioral equilibrium.
- He noted Ms. Miller "did have a history of prior concussions, however, as evident in her history, there were no ongoing sequelae from those incidents.
- He noted Ms. Miller made full recoveries from them and was able to resume her academic, vocational, and military careers at her highest levels of ability within each.
- He concludes the August 25, 2009; accident caused immediate symptoms and significant changes in cognition that prevent her from resuming her previous activities.  These cognitive deficits render her unable to be gainfully employed. He recommended continued ReMed treatment.

Our psychologist is in agreement with the NP IME completed by Dr. Maitz. The medical evidence does not support a pathophysiological pattern and/or cognitive impairment consistent with TBI. Dr. Maitz's opinion is consistent with the test data.

The totality of the records document inconsistencies atypical of patients with TBI serious enough to cause persisting cognitive dysfunction.

These inconsistencies include:

- Ms. Miller continued to work and earned bonuses for her work until four months after her reported injury. She then reduced her hours and eventually stopped working altogether.
- The file does not document any employment performance problems or any complaints to the bar association related to cognitive dysfunction. This ability to work and be rewarded financially through the acute recovery period then stop work is atypical of cognitive impairment from a TBI.
- The military records provided on appeal are incomplete. They do not include medical examinations planned for April 2010, Fitness Reports after July 2009, active duty assignments completed after July 2009, or flight logs.
- As of July 2009, the military medical recommendation for flying or special operation duty form is mostly blocked out. This section pertains to active flying and medical clearance.  The form indicated she was not medically restricted. Her medical clearance would expire on June 30, 2010.
- Her chronological record of medical care indicates she was qualified for worldwide duty. This means she was deemed capable of worldwide deployment with 24-hour notice. (This information was obtained in general discussion with in-house ex-military physicians.)
- As of the February 2010 NP exam, Ms. Miller reports she is a National Guard Reservist. There is no reference she is medically restricted due to head injury or any of her past orthopedic problems.

- During the August 2010 ReMed intake evaluation she reported she had joined the Air National Guard (ANG)in 1983. She continued to fly for the ANG until 2008 and was currently pursuing inactive status.
- A June 2011 letter from the Department of the Air Force indicates Ms. Miller was deemed medically disqualified for worldwide duty. It was recommended she be discharged from ANG. It is noted a medical evaluation had been conducted. A copy of this medical evaluation or cause of medical disqualification is not contained in the claim file.
- This disqualification for worldwide duty occurred almost two years post concussion which represents an inconsistency in the absence of full documentation.
- Information in her Social Security Disability application indicates her employment with the ANG ended in September 2011.

Ms. Miller's report of medical history/symptoms attributed to the fall is also atypical of TBI patients. Ms. Miller either added and/or reported symptoms worsened well after the point measurable cognitive symptoms have resolved. This is usually three months post injury per NP literature on concussion and/or uncomplicated mild TBI. Additionally, her report of symptoms and clinical presentation was inconsistent between providers/examiners.

The inconsistent report of symptoms and misrepresentation of symptoms in clinical presentation was clear on comparison of NP exams. For example:

-Ms. Miller did not report light or noise sensitivity during the February 2010 NP exam. She did not wear earplugs or sunglasses. She reportedly wore sunglasses and used earplugs in NP testing with Dr. King (per Dr. Morris' summary) in June 2011. She wore sunglasses and asked for the lights to be dimmed during the September 2011 NP IME. There was no mention of sunglasses, but asked for a lamp to be turned off due to light sensitivity and reported being distracted by "even faint noise" during the December 2011 exam.

-Ms. Miller first reported word finding difficulty in December 2009. This complaint was repeated plus occasional mixing up word order during the February 2010 NP exam. However, these were not evident during conversational speech or testing per Dr. Lawler. During the September 2011 Ms. Miller had "marked difficulty" with word finding and communication. In December 2011, she had long latencies on a confrontation test she completed almost perfectly in February 2010. She did not have difficulty with communication including the serious problems observed by Dr. Maitz just three months earlier.

Providers and examiners have relied on Ms. Miller's report of her concussion and/or head injury history. Clinical rationales differed from provider to provider. For example:

-Dr. Lawler thought Ms. Miller's prior concussions might explain her protracted symptoms.
-Dr. Morris thought her full recovery from prior concussions meant her current symptoms were explained only by her recent concussion.

Ms. Miller's report of history/symptoms is inconsistent among providers/examiners. For example:

-Dr. Lawler was told she had one prior concussion (MVA in high school).
-Dr's McLaughlin and Dr. Morris were told she had three prior concussions (diving board in high school, motorcycle accident with cracked helmet in 1987, and hit with cargo in the military).

Claimant Name: Miller, Virginia Irene
Claim Number: 5768254

May 3, 2013
Page 9 of 11

-Dr. Maitz was told she had two prior head injuries (diving board and MVA). She reported she "did not know whether she was actually concussed." It is noted Ms. Miller denied loss of consciousness and residual symptoms to all examiners.

-The military records are incomplete as noted above. Per the available documentation, Ms. Miller repeatedly denied a history of head injury, periods of unconsciousness or memory loss/amnesia on reports of medical history before military admission and after motorcycle related accident dated 1983-2000.

-The military records related to her fall off a motorcycle in June 1987 document Ms. Miller had extensive injuries including a left femur fracture. There was no loss of consciousness. There was no impression of head injury or concussion documented in these records or carried forward.

-There are military records related to her report she "caught the bag while twisted and almost fell from being hit with the bag" and "felt something give in my neck and lower back." There were no records of concussion or head injury documented in the available records or carried forward. Her own report on one of these forms contrasted with her report to one examiner that she fell to the ground and saw stars.

-A cervical fusion was performed in December 2002. This was completed despite the surgeon's concern for "her story is somewhat inconsistent" and "we usually like to operate on people that have consistent symptoms and pathology…"

**Conclusions:**

Our reviewing neurologist concludes the medical records around the time of Ms. Miller's fall and reported injury are not consistent with a diagnosis of TBI.

Ms. Miller's report of her hitting the left side of her face and forehead were mentioned secondary to wrist pain. There is no documentation of vomiting as might be found with increased intracranial pressure or brainstem lesion. There was no report of ataxia or dizziness on her initial evaluation. This might be found with clinically significant mild TBI.

Ms. Miller displayed no evidence of difficulty with comprehension. There is no physical evidence of an abrasion, bruise, or loss of consciousness that any head injury occurred. The conclusion of head trauma or concussion is based on Ms. Miller's report.

Our reviewing physician acknowledges Dr. Segal mentions that a subset of patients with mild TBI has persistent symptoms. However, this subset of patients with medically based persistent symptoms has those symptoms documented at onset or within a few days of the injury. This pattern of persistence is not found with Ms. Miller.

Our reviewing psychologist concludes the NP IME and test data is consistent with a Somatization Disorder. The test data does not support a pathophysiological pattern and/or cognitive impairment consistent with TBI.

It is appropriate to administer benefits under the mental illness limitation. No further benefits are payable.

**Our Response to Your Concerns:**

In your letters of appeal you note the following:

-Ms. Miller's physicians disagree with the diagnosis of somatization disorder;

-She has required neurologic treatment and rehabilitation consisting of speech, vestibular therapy and counseling;
-The need for this treatment is a direct result of cognitive and physical restrictions because of concussion and post-concussive syndrome;
-Her head injury suffered on August 25, 2009, has removed her ability to perform two highly skilled professions (litigation attorney and National Guard pilot);
-You disagree with the determination that any impairment is mentally based rather than a cognitive impairment.
- You also disagree Ms. Miller is suffering from a mental illness rather than the documented physical injury of post-concussive syndrome.

On appeal we have taken into consideration your issues and concerns.

Your client has been paid the maximum payment of benefits for disabilities due to mental illness.

We must administer benefits under the terms of the policy.

Based on our review, the decision to deny benefits on her claim is appropriate.

**Policy Provisions that Apply to the Appeal Decision:**

"'Disability' and 'disabled' mean that because of injury or sickness:

1.  the insured cannot perform each of the material duties of his regular occupation; or
2.  the insured, while unable to perform all of the material duties of his regular occupation on a full-time basis, is:
    a.  performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and
    b.  earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness."

Note: For attorneys, "regular occupation" means the specialty in the practice of law which the insured was practicing just prior to the date of disability started."

"The Company, at its own expense, will have the right and opportunity to have an employee, whose injury or sickness is the basis of a claim, examined by a physician, other health professional, or vocational expert of its choice.  This right may be used as often as reasonably required."

"MENTAL ILLNESS LIMITATION

Benefits for disability due to mental illness will not exceed 24 months of monthly benefit payments unless the insured meets one of these situations:

1.  The insured is in a hospital or institution at the end of the 24 month period.  The monthly benefit will be paid during the confinement.

    If the insured is still disabled when he is discharged, the monthly benefit will be paid for a recovery period of up to 90 days.

If the insured becomes reconfined during the recovery period for at least 14 days in a row, benefits will be paid for the confinement and another recovery period up to 90 more days.

2. The insured continues to be disabled and becomes confined:
   a. after the 24 month period; and
   b. for at least 14 days in a row.

   The monthly benefit will be payable during the confinement.

   The monthly benefit will not be payable beyond the maximum benefit.

"Hospital" or "institution" means facilities licensed to provide care and treatment for the condition causing the insured's disability.

"Mental illness" means mental, nervous or emotional diseases or disorders of any type."

"TERMINATION OF DISABILITY BENEFITS

Disability benefits will cease on the earliest of:

1. the date the insured is no longer disabled;
2. the date the insured dies;
3. the end of the maximum benefit period;
4. the date the insured's current earnings exceed 80% of his indexed pre-disability earnings."

**Next Steps Available to your client:**

Upon written request, you are entitled to receive, upon request and free of charge, reasonable access to, and copies of all documents, records and other information relevant to your client's claim for benefits.

If your client disagrees with this decision, you have a right to bring a civil suit under section 502(a) of the Employee Retirement Income Security Act of 1974.

Your client and their plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency.

Attorney Flandreau, if you have any questions, please contact me at 1-800-413-7670, extension 55740.

Sincerely,

*Denise J Laverriere ALHC*

Denise J Laverriere ALHC
Lead Appeals Specialist

EXHIBIT F

# PAUL, FLANDREAU & BERGER, LLP

**Attorneys At Law**
320 WEST FRONT STREET
MEDIA, PENNSYLVANIA 19063
www.pfblaw.com

EDWARD R. PAUL
JAMES R. FLANDREAU
TIMOTHY A. BERGER
DENISE E. MURRAY

(610) 565-4750
FAX (610) 565-5294

OF COUNSEL
PETER A. MARDINLY *
*MASTER OF LAWS (TAXATION)

February 10, 2014

The Benefits Center
Appeals Unit
Attn:  Denise J. Laverriere, ALHC
P.O. Box 9548
Portland, ME 0104-5058

Re:     Virginia Miller  v. Anderson, Kill & Olick, P.C.
        Claim Number 5768254
        Policy Number 43738

Dear Ms. Laverriere:

As you know from our previous correspondence, we represent Virginia Miller.  By letter dated May 3, 2013, Unum denied Ms. Miller's appeal of the termination of her long-term disability benefits.

We had previously reserved the right to submit additional records and evidence as we received updates from Ms. Miller's treating physicians.  We were having difficulty obtaining medical records from the Veteran's Administration, with which she began treating in March 2013.

At long last, we have now received records from the VA for the period from 3/22/13 to 12/24/13.  I enclose a copy of those records.  Given that we had reserved the right to submit additional records and were unable to previously provide them because of circumstances beyond our control, I ask that you reopen the appeal and consider the VA records.

You will note that there is no indication in these records that Ms. Miller's treating health professionals are finding any evidence of somatization disorder or mental illness.  She has been receiving therapies and services oriented towards improving her ability to function, including by using external memory aids.  A neuropsychological assessment for TBI competed on May 8, 2013 noted cognitive impairments associated with a traumatic brain injury.  A TBI second level evaluation performed on 5/31/13 concluded that the history of the injury and course of clinical

The Benefits Center
February 10, 2014
Page 2

symptoms were consistent with a traumatic brain injury and that the current clinical presentation was also consistent with a traumatic brain injury.  On August 22, 2013, a comprehensive neuropsychological evaluation yielded test results "judged to accurately represent Ms. Miller's current levels of cognitive and mood/neurobehavioral functioning.  Behavioral observations during testing and the interview, as well as Ms. Miler's pattern of test responses, indicated that she demonstrated an appropriate degree of effort and persistence throughout testing."  Her pattern of cognitive weaknesses and impairments indicated that she had suffered a traumatic brain injury.

   The records accordingly once again underscore that Ms. Miller's ongoing difficulties are physical in origin and not the result of a mental illness or similar condition that is subject to the 24 month cap.

Very truly yours,

TIMOTHY A. BERGER

TAB:mtf
Enclosures
cc: Virginia Miller

EXHIBIT G

Unum
Appeals Unit
PO Box 9548
Portland, ME 04104-5058
Phone: 1-800-858-6843
Fax: 207 575 2354
www.unum.com



February 21, 2014

TIMOTHY BERGER
PAUL, FLANDREAU & BERGER, LLP
ATTORNEYS AT LAW
320 WEST FRONT STREET
MEDIA, PA 19063

RE:   Miller, Virginia Irene          DOB: June 22, 1965
      Claim Number:                    5768254
      Policy Number:                   43738
      First Unum Life Insurance Company

Dear Attorney Berger:

We are in receipt of your letter dated February 10, 2014, received on February 14, 2014.

Please refer to our letter of March 8, 2013, addressed to Attorney Flandreau (copy enclosed).
Our letter explained Ms. Miller had been provided with greater than 180 days to perfect her
appeal. The plan does not provide for unlimited extensions. Therefore, we were moving forward
with the appellate review.

We made our appeal decision on May 3, 2013.

Our appeal decision of May 3, 2013, included a comprehensive review of the relevant period
(July 2012).  The administrative record is closed as of May 3, 2013.

We acknowledge the information you submitted covers the period of April 2013 through
December 2013.  Unum will not be reopening the file at this late date.  Unum has added the
submitted information to the claim file, but we do not consider this information to be part of the
administrative record.

Unum Life Insurance Company of America has completed a review of Ms. Miller's appeal. No
further review is available and her appeal is now closed.